**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

LYNNETTE K. HEDINGER,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C04-4108-MWB

**REPORT AND RECOMMENDATION**

_____

### *TABLE OF CONTENTS*

*I.*     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . **2**

    *A.*    **Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    *B.*    **Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

        *1.*    **Introductory facts and Hedinger's hearing testimony** . . . . . . . . . . **3**

        *2.*    **LeRoy Hedinger's hearing testimony** . . . . . . . . . . . . . . . . . . . . **7**

        *3.*    **Hedinger's medical history** . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

        *4.*    **Vocational expert's testimony** . . . . . . . . . . . . . . . . . . . . . . . . **10**

        *5.*    **The ALJ's decision** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

*III.*   **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
         THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . . . **13**

    *A.*    **Disability Determinations and the Burden of Proof** . . . . . . . . . . . . . . **13**

    *B.*    **The Substantial Evidence Standard** . . . . . . . . . . . . . . . . . . . . . . . . **15**

*IV.*   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*V.*    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

# I. INTRODUCTION

The plaintiff Lynnette K. Hedinger ("Hedinger") appeals a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits. Hedinger claims a preponderance of the evidence indicates she is disabled. (*See* Doc. No. 6)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On January 8, 2003, Hedinger filed an application for DI benefits, alleging a disability onset date of March 18, 2001. (R. 100-02) Hedinger alleged she was disabled due to "[r]epeated detached retinas, heart bypass, stent, [and] diabetic." (R. 108) She stated her condition limits her ability to work because she is unable to see with her left eye, and her "breathing isn't what it used to be - complication from insulin." (R. 109) Her application and request for reconsideration both were denied. (R. 81-92)

Hedinger requested a hearing (*see* R. 93), and a hearing was held before ALJ Robert Maxwell on April 19, 2004, in Spencer, Iowa. (R. 28-80) Hedinger was represented at the hearing by attorney David Scott. Hedinger testified at the hearing, as did her husband, LeRoy Hedinger. Vocational Expert ("VE") William Tucker also testified at the hearing.

On July 12, 2004, the ALJ ruled Hedinger was not entitled to benefits. (R.9-21) Hedinger appealed the ALJ's ruling, and on September 18, 2004, the Appeals Council denied Hedinger's request for review (R. 4-6), making the ALJ's decision the final decision of the Commissioner.

Hedinger filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated

September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Hedinger's claim. Hedinger filed a brief supporting her claim on February 22, 2005. (Doc. No. 6) The Commissioner filed a responsive brief on April 12, 2005 (Doc. No. 7).

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Hedinger's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Hedinger's hearing testimony

At the time of the hearing, Hedinger was forty-five years old. She lived with her husband LeRoy in Primghar, Iowa.[1] Hedinger completed high school. During high school, she took six weeks of training to become a nurse's aide. (R. 31-33)

Hedinger was employed providing child care for a neighbor's two children from 1990 to 1992. From 1992 to 2001, she worked in the mail room at Kay Products, delivering mail within the company. (R. 33)

Prior to August 2000, Hedinger considered herself to be in good health generally. In August 2000, she began to have chest pains. She went to the emergency room in Primghar, Iowa, and was referred to cardiologists in Sioux City for further care. Hedinger ultimately had triple bypass surgery. She recuperated at home in Primghar, traveling to Sioux City for her followup care. In November 2000, her doctor released her to return to work. She started working partial days and then returned to full days, every

---

[1]The hearing transcript says "Gesia, Iowa," but all the notices to Hedinger and the paperwork she filed indicates she lived in Primghar.

other day. She eventually was working twenty to twenty-five hours per week, but she never returned to working full-time. (R. 34-37)

On about March 2, 2001, Hedinger was laid off at Kay Products. She received unemployment benefits and tried to find another job for about ten weeks, but then she began feeling bad again. She was tired and she had to sit and rest to get through the day. If she leaned over, or walked very far, she might become dizzy. By April 2002, she was having significant problems and returned for further evaluation by the cardiologists. On May 3, 2002, she had cardiac catheterization that led to placement of a stent. (R. 38-41, 61-62; *see* R. 169-70)

The stent placement helped Hedinger feel somewhat better. Some of her strength returned, but she still lacked the strength and stamina to return to work. She testified she could not have returned to the mailroom job because it involved a lot of lifting, and walking from department to department. She had to lift boxes of mail weighing ten to twenty pounds from underneath the mail cart into another box. (R. 40-42)

Hedinger stated she has diabetes, and according to her, doctors told her the diabetes was probably a factor in the development of her heart condition. (R. 42) In addition to her heart problems, she was diagnosed in September 2002 with diabetic retinopathy in both eyes. The condition was worse in her left eye, and Hedinger had surgery in an attempt to stabilize or reattach her left retina. After the surgery, she retained some vision in her left eye, but not enough to read. She subsequently bumped her head, causing her retina to detach again, and requiring a second surgery. Her retina subsequently detached again, and in late November 2002, doctors decided not to attempt a third surgery, leaving Hedinger without vision in her left eye. (R. 43-46)

Hedinger underwent two laser treatments in her right eye, and she continues to return for monitoring of the right eye, which has "pretty good" visual acuity, ranging

from 20/20 to 20/25. (R. 46-47) However, she has small obstructions in her field of vision, which she described as a "line and then the wall of dots." (R. 47) The visual obstructions make it difficult for her to read, and her peripheral vision is impaired (R. 48-49)

After she lost the vision in her left eye, Hedinger's depth perception was impaired. She has difficulty going up and down stairs and she does not trust her depth perception. (R. 46-47) She can perceive light and darkness in her left eye, but she cannot see objects. With her right eye, she can see relatively clearly if objects are directly in front of her, but she has problems seeing out to the side, and she must turn her head in order to see to the side. She is able to read print that is "of an ordinary size," but she prefers large-print type. She drives very little because she is afraid to drive, but she still has a valid driver's license and no doctor has told her not to drive. Her license was renewed in January 2004, and they added a restriction that she must have outside mirrors on both sides of her vehicle. (R. 47-52, 66) She will drive the seven miles from her home in the country into town, but she does not drive longer distances. (R. 67)

Hedinger stated that because of her visual impairment, she spends most of her time at home where she knows where things are located. (R. 52) She does not spend time trying to read magazines or newspapers because it "takes so long to focus." (R. 53) She indicated her visual problems do not affect her ability to give herself insulin injections because she uses a syringe that clicks when the dosage is correct. (R. 63) She monitors her blood sugar four times daily, and she uses a monitor that has a large readout. (R. 63-64)

Hedinger stated her physical activities around the house have been limited due to her cardiac problems. She cooks and takes care of her personal needs. She and her husband share the cleaning and the laundry, and her husband does the vacuuming.

(R. 53, 59)  She takes short naps every day, in the morning and the afternoon, and she believes it would be difficult for her to get through the day without napping.  She is able to walk a mile most days, although she is tired when she completes her walk.  She does not walk the mile all at once, but divides her walking into two sessions of a half mile each, one session in the morning and one in the afternoon.  (R. 54-55)  During cold weather, she walks on a treadmill in her home for twenty  minutes, twice a day.  (R. 58-59)

Hedinger saw her cardiologist in October 2003, for a checkup and a treadmill test.  Toward the end of the treadmill test, her chest began to get tight and she was out of breath, and she felt tired after the test was over.  She takes several medications for her heart, cholesterol control, blood pressure, thyroid, and diabetes.  Her blood pressure is still "a little high," but largely is under control.  (R. 55-58)  She stated her medications make her feel tired.  (R. 57)

According to Hedinger, her doctors have told her she can perform activities as tolerated.  (R. 57)  She indicated it would be difficult for her to return to work now due to fatigue and shortness of breath.  (R. 59)  Her doctors have not limited her activities due to her visual problems.  (R. 64)

Hedinger stated she also suffers occasionally from hypoglycemia.  She took a trip to Germany in August 2003, with her father and sister.  After they had been in Germany for a couple of days, Hedinger's blood sugar dropped very low and, according to her, doctors thought she had suffered a stroke.  She stated she normally does not have problems maintaining her blood sugar.  (R. 63-64)

The ALJ noted that Hedinger appeared well groomed at the hearing.  Hedinger stated she can do her own hair and makeup because she can see straight ahead of her.  (R. 66)

**2.** ***LeRoy Hedinger's hearing testimony*** (R. 68-72)

LeRoy Hedinger ("LeRoy") is Hedinger's husband. He stated since Hedinger's health problems began, she has "really slowed down" at home and he has helped out a lot more with the housework. He has always helped with housework, but from the time Hedinger's heart problems began, he has done more and more at home. He stated Hedinger avoids stairs because she has difficulty "stepping up and down them." According to LeRoy, Hedinger never drives at night and does not drive in "bigger towns"; she only drives during the daytime, and just in Primghar or Paullina, Iowa.[2] If anyone else is with her, Hedinger has the other person drive.

According to LeRoy, Hedinger has little stamina and she tires quickly. He opined she would be unable to perform any type of work activity. He noted she is no longer quick enough and cannot see well enough to do child care, an activity she used to perform.

LeRoy works as a bridge laborer. He works full-time, year round. He has health insurance that covers Hedinger's medical expenses.

LeRoy did not accompany Hedinger to Germany in August 2003, but he stated they have traveled to Germany and Hawaii on other occasions. He stated Hedinger's diabetes has caused her some problems traveling.

**3.** ***Hedinger's medical history***

The record indicates Hedinger has been under medical management for her insulin-dependent diabetes since at least August of 2000. (*See* R. 158-64, 152-53) Hedinger has had some difficulty controlling her blood sugar (*see id.*), but other than one overnight

---

[2]The record states "Plena" (*see* R. 67, 69), which does not exist in Iowa. Hedinger and her husband clearly were referring to Paullina, Iowa, which is about ten miles from Primghar.

hospitalization in November 2000 (*see* R. 152-53), and the drop in blood sugar she experienced while in Germany (*see* R. 63-64), she does not appear to have had any incidents in recent years related to her blood sugar.

The record further indicates Hedinger underwent coronary artery bypass grafting on August 4, 2000. Records of Jerome Pierson, M.D. indicate Hedinger returned to the hospital in congestive heart failure, but once she was stabilized, she "made a very nice recovery." (R. 169) A follow-up stress test revealed evidence of ischemia. As a result, cardiac catheterization was performed in May 2002, and Hedinger was found to have occlusion of some of her grafting. She underwent angioplasty of the native right coronary artery, had no difficulties or complications, and was discharged in stable condition. (R. 169-70) In September 2002, Dr. Pierson noted Hedinger had done well since the cardiac catheterization, with no recurrent symptoms, and no new complaints or concerns. He stated, "She is able to do her usual sort of activities with minimal limitations. She is able to get around nicely. She feels well." (R. 178)

Dr. Pierson examined Hedinger in October 2003, and noted the following:

> Since the last time we saw Mrs. Hedinger she has done well. She did have one instance when she ended up in the hospital in Germany with hypoglycemia but there was no evidence of myocardial infarction or problems along those lines. The patient states that she has actually been doing very well. She remains active exercising on a treadmill, doing her usual sort of activities, not having any chest pain, pressure, tightness, shortness of breath, heart failure symptoms or any other problems. At this point she seems to be getting along very well and feels quite well. She does have some swelling in her left ankle which is the graft donor leg but other than that she seems to be doing okay.

(R. 361) Dr. Pierson encouraged Hedinger to exercise regularly. (R. 362)

With regard to Hedinger's eyes, the record indicates Hedinger's vision was stable from the fall of 2000, up until September of 2002, when she began to notice blurring and lines or dots in her field of vision. (*See* R. 255-59) In September 2002, she was diagnosed with proliferative diabetic retinopathy of her left eye, with nonclearing vitreous hemorrhage and traction retinal detachment. She underwent two vitrectomy procedures, one in September 2002, and one in October 2002, but doctors were unable to restore the vision in Hedinger's left eye, leaving her blind in that eye. (*See* R. 264-66, 261, 62, 327)

Hedinger underwent two laser procedures to her right eye in September 2002, and as of March 31, 2003, the vision in her right eye was 20/20 with correction. Her cornea, lens, and anterior chamber were clear. Dennis D. Gordy, M.D. noted Hedinger had "normal vision in her right eye and may need further laser treatment in her right eye." (R. 327) As of April 2004, her condition was unchanged, with no vision in her left eye, and corrected 20/20 vision in her right eye, although examination showed she has "a general depression of the peripheral visual field," secondary to the laser procedures on her eye. (R. 372)

J.D. Wilson, M.D. reviewed Hedinger's records and completed a Physical Residual Functional Capacity Assessment form on April 10, 2003. (R. 353-59) He opined Hedinger would be able to lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in a normal workday; and push or pull without limitation. The only limitations he found her to have were visual limitations, due to which he opined she should avoid hazards. He noted that James Cole, M.D., the surgeon who performed Hedinger's vitrectomy procedures, had stated Hedinger "would have difficulty reading fine print, driving a vehicle commercially or flying a plain [sic], which require keen peripheral and central vision," but he found no other evidence in the

record that Hedinger would be limited visually. (R. 359) Claude H. Koons, M.D. reviewed Dr. Wilson's findings on April 10, 2003, and concurred in the latter's conclusions. (R. 259-60)

### 4.    *Vocational expert's testimony*

The VE indicated Hedinger had not acquired any skills from her past work that would transfer to other semi-skilled, but less physical, occupations. (R. 73) The ALJ asked the VE to consider an individual under fifty years of age with a high school education, certification during high school as a nurse's aide, no additional education or training, and she has not used her nurse's aide training in the last fifteen years. Further, the person has medically-determinable impairments that cause work-related limitations consistent with Hedinger's testimony.

The VE noted Hedinger had testified that lifting ten to twenty pounds was too heavy for her; she has depth perception problems, tunnel vision, and takes a long time to focus; and she is tired and slow in performing her chores. Based on that testimony, the VE opined she would be unable to work in a fully competitive work environment, either performing her past work or in any other job (R. 75)

The ALJ then asked the VE to consider a person of the same age, education, and work experience, but with the following limitations:

> [She] can occasionally lift or carry 20 pounds, frequently 10 pounds. Could stand or walk with normal breaks for about six hours of eight. Likewise sitting with normal breaks for about six hours of eight. Push/pull is unlimited. Assume no postural, manipulative, commu[nica]tive limits. Environmentally they would avoid concentrated exposures to hazardous working conditions. . . . [N]o visual limitations in the right eye with 20/25 vision. Due to the non-clearing hemorrhage and retinal detachment[,] the claimant would have

> limitations in near, far, depth perception, accommodation and field of vision with the left eye. . . . On this assessment, if credited, would you expect a person to be able to do either of the claimant's past job?

(R. 75-76)

The VE responded, "I think that the limitation in vision would probably rule out the mail clerk. And the exertional limits, the child monitor work is considered to be medium work and this is no more than a light hypothetical so she would not be able to return to her previous work." (R. 76) However, the VE opined the hypothetical individual could perform work as a production assembler, laundry folder, or cashier II. (*Id.*)

The ALJ then added the visual limitations of "no useful vision in one eye," corrected vision in the other eye of 20/25, but "some difficulties in field of vision [causing] difficulties off to the side in seeing in the good eye." (R. 77) The VE indicated those limitations would not affect the individual's ability to perform the production assembler and laundry folder jobs, but might affect her ability to perform the cashier II job. (R. 77) However, if the individual has remaining visual acuity sufficient to operate a passenger vehicle, then the VE opined she should be able to perform any of the listed jobs. He stated all of those jobs required less demanding visual acuity than driving a vehicle. (*Id.*)

## 5. *The ALJ's decision*

The ALJ first noted that Hedinger has claimed disability from the date she was laid off from work at Kay Products; however, she received unemployment benefits for ten weeks after that date and she continued to look for work during that time period. (R. 14) The ALJ found Hedinger's allegations regarding her functional limitations following that

11

time to be "exaggerated, not fully credible, and not substantially supported by medical evidence and opinion in record to the degree alleged when considered in its entirety." (R. 15)   He noted Hedinger's doctors have not told her she cannot return to work, but have only told her to stop working "if things got too strenuous." (*Id.*)   The ALJ concluded Hedinger has done very well physically since placement of the stent in May 2002. (R. 15-16)

The ALJ found Hedinger's testimony to be credible, and consistent with the medical evidence of record, regarding her visual impairment and resultant functional limitations.   However, he noted the record showed no significant visual difficulties prior to September 2002.   The ALJ found that since that time, Hedinger has been limited in her ability to read fine print for any length of time or perform duties requiring "keen peripheral and central vision," and she should avoid hazardous work, but otherwise, she has no significant limitations due to her visual impairment. (R. 17)

Based on his evaluation, the ALJ concluded Hedinger has severe impairments "consisting of coronary artery disease, status post three vessel bypass surgery and subsequent angioplasty and stenting of the right coronary artery, as well as diabetic retinopathy with reduced field of vision in the right eye and blindness in the left eye." (R. 18) However, he found these impairments, alone or combined, did not meet or equal the Listing requirements. (*Id.*)

The ALJ adopted the VE's opinion that Hedinger would be able to perform work as a small products assembler and a laundry folder.   He therefore concluded Hedinger was not disabled. (R. 18-19)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as
> "the abilities and aptitudes necessary to do most jobs." . . .

> Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if

necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial

evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999)); *accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796*; Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560,

564 (8th Cir. 1991)).   The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial."   *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence.   *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)).   The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*"   *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)).   Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision."   *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).   This is true even in cases where the court "might have weighed the evidence differently."   *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213).   The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision."   *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied,* 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)        the claimant's daily activities;
> 2)        the duration, frequency and intensity of the pain;
> 3)        precipitating and aggravating factors;
> 4)        dosage, effectiveness and side effects of medication;
> 5)        functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).

## IV.  ANALYSIS

Hedinger argues her "tunnel vision, lack of depth perception, and the time it takes her to focus with her right eye at the present time, make it impossible for her to work in a competitive work environment . . .  In addition, [she] fatigues easily and could not even occasionally lift ten pounds."  (Doc. No. 6, p. 4)  She argues the evidence shows she was unable to function in the workplace between July 24, 2000, and May 2003, "during which time she underwent at least four major surgical procedures for coronary insufficiency and loss of her vision."  (*Id.*)

The court notes Hedinger has claimed a disability onset date of March 18, 2001, which was after her first heart surgery.  She testified she was laid off from her job on or about March 2, 2001, and she collected unemployment and looked for work for about ten weeks after that time.  This undermines her claim that she was disabled as of March 18, 2001.

Hedinger claims she began feeling ill again at some point, and the record indicates she underwent cardiac catheterization and stent placement in May 2002.  Her cardiologist noted she has done very well since the catheterization procedure, and she is "able to do her usual sort of activities with minimal limitations."  (R. 178)  Thus, the evidence indicates that although Hedinger likely was unable to work for several months due to her heart condition, her inability to work did not last at least twelve months, mandating a finding that she was not disabled due to her heart condition.  *See* 20 C.F.R. § 404.1527(a)(1).

Hedinger's eye problems surfaced in September 2002, when she began noticing "floaters" or obstructions in her field of vision.  She was diagnosed with diabetic retinopathy and underwent laser procedures and surgery in an attempt to save her vision.  Although she lost the vision in her left eye, Hedinger's doctors' reports indicate her

corrected vision is 20/20 in her right eye, with some loss of peripheral vision, and she should have difficulty with fine print tasks, or performing jobs that require keen peripheral and central vision, such as driving a vehicle commercially or flying an airplane. However, Hedinger continues to drive her own vehicle at times, and other than the stated limitations, her eye doctors have not restricted her activities due to her visual impairment.

Considering the record as a whole, the court finds there is substantial evidence to support the Commissioner's decision that Hedinger was not disabled at any time through the date of decision.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service

---

[3]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 14th day of July, 2005.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT